## Case No. 7,530.

In re JOREY et al.

[2 Bond, 336; [1] 2 N. B. R. 668.]

District Court, S. D. Ohio. Feb. Term, 1870.

Fox & Bird, for creditors.
Warden & Egly, for bankrupts.

OPINION OF THE COURT. The question before the court arises on objections to the

[1] [Reported by Lewis H. Bond, Esq., and here reprinted by permission.]

discharge of said bankrupts. They filed their petition in bankruptcy on December 31, 1868, alleging the insolvency of the firm of John Jorey & Sons, and praying for the benefit of the bankrupt law. On the —— day of February, 1869, there was an adjudication of bankruptcy on the petition of the said firm, and an assignee duly appointed and qualified. Objections to a discharge have been filed by J. O. Flickner, a creditor of the firm, who had duly proved his claim. These objections are numerous; and, on application for that purpose, an order of court was entered referring the same to Register Cranch, to take testimony in relation thereto, and report the same to this court. In pursuance of this order, the members of said firm have been examined, and the testimony of other persons taken, and reported to the court. Counsel for the objecting creditor, and for the firm, have been fully heard, and the question is, whether the members of the firm are entitled to a discharge.

There are seven grounds of objection to the discharge filed by Flickner. Two only of the objections will be noticed, as these, in the judgment of the court, are decisive of the question submitted. The sixth exception is, "that said bankrupts, being merchants or tradesmen, have not, subsequently to the passage of the bankrupt act, kept proper books of account." This objection seems to be fully sustained by the proofs reported by the register. It appears that for some years before their application in bankruptcy, the said firm of John Jorey & Sons had been engaged in the business of manufacturers of and dealers in shoes, at the city of Cincinnati. John Jorey, the father of the other partners, in his examination, states that, in his opinion, the business of the firm, for the two years prior to filing their petition in bankruptcy, was about thirty thousand dollars for each of those years. He admits this was a mere estimate, and that the books of the firm did not afford the means of information as to the extent of their sales. He also states the firm employed no book-keeper, and that, in fact, no regular books were kept. There were no written articles of partnership, and the books did not show the state of the accounts between the members of the firm, or what sums each partner appropriated from the means of the firm, or what each paid or advanced in the prosecution of its business. In short, the books kept contained no exhibit of the state of accounts as between the partners. It also appears there were but partial entries of stock purchased, and no account of the debts and liabilities of the firm; that when sales were made for cash in hand, no entries were made, and when made on credit, they were noted on a slate, and upon payment the charge was obliterated and no entry made in a book. Entries on the slate, when not thus disposed of, were transferred to a book, as the leisure or convenience of the

partners would permit. In a word, without noting in detail the singularly loose and imperfect way of keeping the transactions of the firm, it is most obvious from an inspection of the books, that it would be impossible to ascertain the dealings or operations of the firm. This conclusion is verified by the statement of John Jorey in his examination, that he made out his schedule of the debts and liabilities of the firm mainly from memory, as the books did not afford the data enabling him to do it.

Section 29 of the bankrupt act contains a very minute specification of the numerous grounds which shall bar a discharge to a bankrupt; or, if granted, shall invalidate it. The clause relating to keeping books is as follows: "If being a merchant or tradesman, he (the bankrupt) has not, subsequently to the passage of this act, kept proper books of accounts." The members of this firm were clearly tradesmen within the meaning of this act, though not doing a very extensive business in their line. And it was clearly the policy and intention of the statute that no one within the scope of the clause referred to should receive a discharge, unless he kept books, after the passage of the law, that would fully and truthfully exhibit his business transactions. This is well stated by Mr. Justice Grier, late of the supreme court of the United States, in the case of In re Solomon [Case No. 13,167]. The learned judge says: "The policy of the act requires that any merchant and trader should keep such books of account as, considering the business and condition of the debtor, would enable any competent person, from the books and invoices, to ascertain the real condition of the debtor's affairs." And again, in Re White [Id. 17,532], the court refused a discharge because the bankrupt kept no invoice or stock books. I concur fully in the decisions in these cases, and they are directly in point on the question under consideration. It is not easy to conceive of greater looseness and deficiencies in keeping books than are apparent in the case of the firm of Jorey & Sons. Not only were their business transactions and the condition of the firm unintelligible to others from their books, but the parties did not understand them when they filed their petition in bankruptcy. This is clear from the reference before made to the facts.

The suggestion of counsel, that no fraud was intended by the loose and defective way of keeping the books of the firm, is no answer to the objection made to a discharge on this ground. The statute makes it a bar to a discharge, irrespective of the intention. If it were otherwise, it is obvious a wide door would be opened for the commission of frauds, without a reasonable hope of detection.

There is one other exception set forth in the specifications filed by the objecting creditor, to which I will briefly advert. It is, in

substance, that the firm, or some of its members, have made payments and transfers, of property, immediately before the application in bankruptcy, involving preferences, in violation of the statute. One clause in section 29 of the act provides, that if the bankrupt "has given any fraudulent preference contrary to the provisions of this act, or made any fraudulent payment, gift, transfer, conveyance, or assignment of any part of his property, he shall not receive a discharge." In his examination, John Jorey admits that just preceding the petition in bankruptcy by the firm, he gave his wife $600 in cash, to pay expenses of the family. This the law does not authorize. He claimed, and there was set off to him by the assignee, certain property and assets, exempt from the operation of the bankrupt act, which was all he had a right to retain. The money given to his wife belonged to his creditors, and should have been entered on his schedule of property and assets. He returns no cash on hand, whereas he should have included the $600 in the schedule. This, however intended, was a fraud upon, and in violation of, the statute. In addition to this, without noticing other unlawful preferences, it appears that John Jorey transferred to his brother-in-law, Dingle, several promissory notes held by him, in payment of a debt due to Dingle. This was after the insolvency of the firm was known by the bankrupts, and by the person to whom the payment was made. It was, therefore, a preference in violation of the statute.

Without referring to the other objections to the discharge of these bankrupts—some of which are clearly sustained by the proofs—I have no hesitancy in holding that their discharge must be refused.